UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

READY SEAFOOD CO.,

      Plaintiff,

v.

ANDREW DAUGHAN, ROBERT KRAGH,
and PACKERS PRIDE USA, LLC,

      Defendants.

Civil Action No.:

## COMPLAINT

### (INJUNCTIVE RELIEF SOUGHT)

Plaintiff Ready Seafood Co. ("Plaintiff," "Company," or "Ready Seafood"), for its Complaint against Defendant Andrew Daughan ("Daughan"), Defendant Robert Kragh ("Kragh"), and Defendant Packers Pride USA, LLC ("Packers Pride") (collectively "Defendants"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Ready Seafood is a corporation duly organized and existing under the laws of the State of Delaware, registered to do business in the State of Maine, with operations in Saco, County of York, and Portland, County of Cumberland, State of Maine.

2.     Daughan is an individual who resides in York, County of York, State of Maine.

3.     Kragh is an individual who resides in Madison, County of New Haven, State of Connecticut.

4.     Defendant Packers Pride is a corporation duly organized and existing under the laws of the State of New Hampshire, with a principal place of business in Manchester, County of

Hillsborough, New Hampshire, and regularly conducts business outside of New Hampshire, including in the State of Maine.

5.      This Court has federal question jurisdiction and supplemental jurisdiction over this matter pursuant to *28 U.S.C.A. §§ 1331* and *1367*, respectively.

6.      Venue is appropriate pursuant to *28 U.S.C.A. § 1391* both because a substantial part of the events giving rise to the claims herein occurred in the State of Maine and in the alternative, the United States District Court, District of Maine has personal jurisdiction over all three Defendants.

## JURY TRIAL DEMAND

7.      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.      Ready Seafood is engaged in the highly competitive business of supplying live and processed lobster products to retail, wholesale, and food service companies across the globe.

9.      Ready Seafood has expended substantial effort and expense in growing its customer relationships via acquisition of each customer's particular needs.

10.     This information is derived through considerable effort and expense, is not generally known to competitors, and is paramount to Ready Seafood's ability to gain a competitive edge in the marketplace. Acquiring business relationships with premium customers, *i.e.*, the largest volume customers, take years to develop.

11.     On or around April 24, 2018, Ready Seafood hired Daughan, a veteran in the industry with over 15 years of experience, as its Vice President of Category Management.

12.     Daughan was primarily responsible for key account management and inventory management. Daughan was deeply involved in developing Ready Seafood's high-level, forward-

thinking, confidential corporate strategy; including, forecasting and gauging customer demands for lobster product as well as participating in the process of adjusting pricing to ensure repeat purchase orders and a positive profit margin.

13.    On or around October 9, 2023, Ready Seafood hired Kragh, another veteran in the industry with over 21 years of experience, as its Vice President of Sales. Kragh was primarily responsible for making sales and interacting with Ready Seafood's customers, particularly, many of Ready Seafood's premium customers.

14.    Given their positions, both Daughan and Kragh had access to Ready Seafood's confidential customer proprietary information, which included, the identity of Ready Seafood's customers, profit margins, customer product volume demand, customer product pricing, and customer purchase history.

15.    Ready Seafood protects its confidential customer proprietary information by restricting and/or limiting employee access. In this regard, Daughan and Kragh were two members of a small, five-person sales team who had limited access to Ready Seafood's confidential customer proprietary information. Aside from the small sales team, Ready Seafood restricts/limits access to others at Ready Seafood on a need-to-know basis.

16.    In or around 2018, Ready Seafood was sold to Premium Brands Holdings Corporation. In conjunction with that transaction, certain key Ready Seafood employees, including Daughan, received an earnout.

17.    Maine Seafood Ventures Holdco, LLC ("MSV"), a holding company established by the then Ready Seafood ownership to administer the earnout, memorialized the terms of the earnout in a Management Unit Subscription Agreement (the "Agreement").

18.     Daughan signed the Agreement on August 27, 2018. A true and correct copy of Daughan's signed Agreement is attached hereto as ***Exhibit A***.

19.     In exchange for a $92,646.93 earnout, Daughan agreed to abide by certain restrictive covenants including, non-compete, non-solicitation, and confidentiality provisions.

20.     The non-competition provision provides that for two years from the termination of his employment with Ready Seafood, Daughan would not:

> … acquire or own in any manner any interest in any … limited liability company, … which (1) engages or plans to engage in the Business at any time during the Restricted Period, or (2) competes or plans to compete in any way with the Business, anywhere in the Territory; or (B) be employed by or serve as an employee, agent, officer, director of, or as a consultant to, any Person which (1) engages or plans to engage in the Business, or (2) competes or plans to compete in any way with the Company during the Restricted Period.

***See Ex. A, App. A, § 1(a).***[1]

21.     Daughan "expressly authorize[d] the enforcement of the covenants provided for in this Section 1(a) by the Company or any successors to the Company's business" (the "Company" is defined in the Agreement to include "any Operating Company Group Member," *i.e.*, "Ready Seafood Co."). ***Id. at § 1.17 and App. A, § 1(d)(i)***.

22.     The non-solicitation provision provides that for two years from the termination of his employment with Ready Seafood, Daughan would not:

> … directly or indirectly, for itself, himself or herself or for any other Person (A) employ, attempt to employ or enter into any contractual arrangement with any employee or former employee of the Company, unless such employee or former employee has not been employed by or affiliated with the Company for a period in excess of 6 months …

***Id. at App. A, § 1(b)***.

---

[1] "Territory" is defined as "the United States" and "Business" as "the processing of lobster meat and the distribution of live and processed lobsters and lobster meat." ***Smith Dec. at Ex. A, App. A, § 1(a)***.

23.    The non-solicitation provision also provides that for two years from the termination of his employment with Ready Seafood, Daughan would not:

> … directly or indirectly, for itself, himself or herself or for any other Person … (B) (1) call on, solicit or service any of the customers … or other business relations of the Company in order to induce or attempt to induce such Person to cease doing business with the Company or to reduce the amount of business it does with the Company, (2) in any way directly or indirectly interfere with the relationship between any such customer … or other business relation and the Company … or (3) disclose or use any information relating in any manner to the Company's trade or business relationships with such customers … or other business relations, (C) induce or attempt to induce any … customer … to … otherwise cease to conduct business with the Company, or in any way interfere with the relationship between the Company and any such Person …

*Id*.

24.    The confidentiality provision provides that following the termination of his employment with Ready Seafood, Daughan:

> … shall not, and shall cause [his], his … Affiliates not to, divulge, communicate, use to the detriment of the Company or for the benefit of any other Person, or misuse in any way, any Confidential Information or Trade Secrets … pertaining to the Company. Any Company Information now known or hereafter acquired by Executive with respect to the Company shall be deemed a valuable, special and unique asset of the Company that is received by such party in confidence and as a fiduciary, and such party shall remain a fiduciary to the Company with respect to all of such information.

*Id. at App. A, § 1(c)*.

25.    On Monday, March 3, 2025, at 8:30 a.m., and without any prior notice, Daughan resigned from Ready Seafood via e-mail, "effective immediately."

26.    Daughan gave no indication of his plans for future employment and/or plans to compete with Ready Seafood. Instead, Daughan merely left his "key FOB and computer on [his] old desk" and abruptly left Ready Seafood's offices.

27.    When he left Ready Seafood's office on March 3, 2025, Daughan took with him ten or more notepads and/or notebooks (collectively, "notebooks") from his desk. Contained in

the notebooks were Daughan's handwritten notes regarding the substance of communications with customers, tasks related to Daughan's role in overseeing Ready Seafood's global sales, tasks related to his role in Ready Seafood's inventory management, and various other notations concerning Ready Seafood's confidential customer proprietary information and strategies for approaching all of the above.

28.     Sometime after Daughan resigned from Ready Seafood, he formed Packers Pride.

29.     On June 6, 2025, at 2:07 p.m., without any prior notice, Kragh also resigned from Ready Seafood via e-mail, "effective immediately."

30.     Kragh gave no indication of his plans for future employment and/or plans to compete with Ready Seafood. Instead, Kragh merely asked for "information on how to return his laptop ..." and abruptly stopped all work for Ready Seafoods.

31.     In the days leading up to his surprise resignation, Kragh accessed a treasure trove of Ready Foods confidential customer proprietary information that he did not otherwise need to access during the final weeks of his employment.

32.     Upon information and belief, Daughan improperly recruited and/or solicited Kragh, to join him in the newly formed Packers Pride.

33.     From in and around May 7, 2025, until June 3, 2025, Kragh accessed confidential customer proprietary information including: (a) two PowerPoint presentations Ready Seafood used in 2023 sales pitch presentations with potential/existing customers; (b) two Excel Spreadsheets, with embedded formulas that Ready Seafood used in May and June 2024 to quote customer purchase orders; (c) an Excel Spreadsheet Kragh created comparing Ready Seafood's 2024 and 2025 purchase order history, product price point, amount of sales revenue generated,

and the corresponding profit Ready Seafood received (reflected in dollars and as a percentage); and (d) a purchase order from July 25, 2024.

34.    Kragh had no reason to access this information in 2025, let alone three days before his June 6, 2025, resignation.

35.    Upon information and belief, Daughan and Kragh intentionally staggered their resignations for the purpose of, on one hand, allowing Daughan time to form Packers Pride and begin soliciting Ready Seafood's clients and, on the other hand, allowing Kragh additional time to misappropriate Ready Seafood confidential customer proprietary information, so that Packers Pride had the benefit of such confidential customer proprietary information to undercut Ready Seafood in the market.

36.    On or around June 13, 2025, a week after Kragh's resignation, Ready Seafood became aware that Defendants improperly diverted an unidentifiable amount of business away from Ready Seafood and realized that Defendants had improperly used Ready Seafood's confidential customer proprietary information to undercut Ready Seafood in the market.

37.    On or around June 13, 2025, a Ready Seafood employee received an erroneous purchase order email from New England Cold Storage, LLC ("NE Cold Storage"), a third-party cold storage facility intermediary, between Ready Seafood and one of Ready Seafood's large volume customers, hereinafter referred to as "*Company 1*."

38.    Kragh serviced Ready Seafood's account with Company 1 while he was an employee of Ready Seafood.

39.    The Ready Seafood employee was able to identify the erroneous nature of the purchase order because it originated from "Seafood 2000" and not Ready Seafood. Like Ready

Seafood, Seafood 2000 also supplies live and processed lobster products to retail, wholesale, and food service companies.

40.     Upon information and belief, Packers Pride, with Daughan and Kragh at its helm, is an exclusive broker of Seafood 2000's lobster products, which are branded as Packers Pride products.

41.     After the Ready Seafood employee identified the erroneous purchase order email, the NE Cold Storage confirmed that the purchase order, in fact, did not originate from Ready Seafood, and instead, it had come from "Andrew [Daughan]."

42.     On or around June 13, 2025, Ready Seafood received a telephone call from another one of Ready Seafood's premium customers, hereinafter referred to as "*Company 2*." The employee of *Company 2*, as a courtesy, informed Ready Seafood that Daughan had recently solicited *Company 2* to purchase lobster from Packers Pride. The employee of *Company 2* also informed Ready Seafood that *Company 2* had rebuffed Daughan's solicitation.

43.     On or around June 13, 2025, Undercurrent News, a global news organization specifically dedicated to the seafood industry, published an article about Defendants' new business venture. A true and correct copy of the Undercurrent News article is attached hereto as ***Exhibit B***.

44.     The Undercurrent News article begins with the statement that "[t]wo long-time lobster industry veterans and colleagues -- Andrew Daughan and Rob Kragh -- have joined forces to form Packers Pride USA, a US-based enterprise founded to represent Canadian and US lobster processing plants to prospective buyers in the US." ***Id***.

45.     Both Daughan and Kragh boast, in the Undercurrent News article, that Packers Pride is a business that is competitive with Ready Seafood.

46.    Kragh is quoted as saying, "[o]ur world is about taking product from plants and matching it up with customers, and the plants want people who can sell their whole run of production, a two-ounce tail to a 20-24 oz tail. And that's kind of the magic. It's understanding who wants what, where." *Id*.

47.    Daughan is quoted as saying, "I think there's a very strong demand for both sides of the animal, which hasn't always been the case. What I mean by that is often times the tails are hot and the meat is weak, or the meat is hot and the tails are weak. I think it's a good spot for processed lobster, and there is great opportunity to continue to grow that and add value to the category." *Id*.

48.    Three days later, on or around June 16, 2025, a Ready Seafood Senior Vice President received a text message from an employee of *Company 3*, another one of Ready Seafood's premium customers.

49.    In the text message, the employee stated that *Company 3* had to "cancel" Ready Seafood's invitation to attend a food distributor trade show scheduled to occur on June 23, 2025. The trade show provides various food vendors the opportunity to showcase their products to dozens of potential customers.

50.    The reason given for the cancelation was because of Kragh's "departure" from Ready Seafood, which Ready Seafood took to mean that Kragh would attend the trade show on behalf of Daughan and Packers Pride.

51.    While employed at Ready Seafood, Kragh played a crucial role regarding Ready Seafood's attendance at the trade show.

52.    Just over a week after the cancelation, on or around June 24, 2025, *Company 3* also cancelled a $98,000 purchase order it had with Ready Seafood.

53.     Finally, on July 9, 2025, Ready Seafood's CEO learned that *Company 4* has begun purchasing lobster from Packers Pride.

54.     While employed at Ready Seafood, and from approximately 2021, until his resignation, Daughan consistently identified *Company 4* in Ready Seafood's quarterly sales meetings as a future premium large-volume customer and, after acquiring *Company 4* as a Ready Seafood customer, Daughan serviced the *Company 4* account while he was an employee of Ready Seafood.

55.     By violating his restrictive covenants, Daughan diverted an unidentifiable amount of Ready Seafood's business with, at least, *Company 1*, *Company 2*, *Company 3*, and *Company 4*, which caused irreparable harm. Additionally, given the speed with which Defendants were able to divert the above referenced business and opportunities, it is apparent that the Defendants misappropriated Ready Seafood's confidential customer proprietary information to undercut Ready Seafood's business.

## COUNT I
## DEFENDANT ANDREW DAUGHAN
## (BREACH OF CONTRACT)

56.     Plaintiff repeats and realleges the preceding allegations as if fully incorporated herein.

57.     Daughan, by his actions, has breached promises he made to abide by the restrictive covenants set forth in the Agreement.

58.     Daughan, by his actions, breached his contractual obligation under the Agreement not to compete with Plaintiff.

59.     Daughan, by his actions, breached his contractual obligation under the Agreement not to solicit Plaintiff's customers.

60.     Daughan, by his actions, breached his contractual obligation under the Agreement not to solicit Plaintiff's employees.

61.     Daughan, by his actions, breached his contractual obligation under the Agreement not to divulge, communicate, use to the detriment of Plaintiff or for the benefit of a limited liability company, or misuse in any way, any of Plaintiff's confidential proprietary customer information or trade secrets.

62.     As a direct and proximate result of Daughan's breaches of contract, Plaintiff, a third-party beneficiary of the Agreement, has suffered, and continues to suffer irreparable harm and damages in an amount to be proved at trial.

**COUNT II**
**ALL DEFENDANTS**
**(VIOLATION OF MAINE'S UNIFORM TRADE SECRETS ACT)**

63.     Plaintiff repeats and realleges the preceding allegations as if fully incorporated herein.

64.     Defendants willfully violated the provisions of Maine's Uniform Trade Secrets Act ("MUTSA"), *10 M.R.S. §§ 1541-1548*, by actually misappropriating and utilizing trade secret information belonging to Plaintiff, by improper means, for Defendants' own benefit. The confidential and trade secret information includes, without limitation, customer identity, profit margins, customer product volume demand, customer product pricing, and customer purchase history.

65.     The trade secrets that Defendants misappropriated are not available to the general public or to Plaintiff's competitors. Plaintiff's confidential and proprietary information constitutes trade secrets under the MUTSA because:

(1) Plaintiff derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain value from its disclosure or use; and

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

66.    Defendants' use of Plaintiff's confidential and trade secret information is a willful and malicious violation of the MUTSA.

67.    Without Plaintiff's authorization, in the days and weeks preceding their sudden resignations, Daughan and Kragh unlawfully gathered documents and information, containing confidential and trade secret information belonging to Plaintiff, for subsequent competition with Plaintiff via Packers Pride.

68.    Daughan and Kragh also have knowledge of Plaintiff's trade secrets such that their working in competition with Ready Seafood will inevitably lead to the disclosure and/or use of Ready Seafood's trade secrets and therefore, Defendants competing with Ready Seafood creates a threat of improper use and disclosure of Ready Seafood's trade secrets.

69.    Daughan and Kragh had a duty to maintain the secrecy of Plaintiff's confidential and trade secret information.

70.    Daughan and Kragh breached their duty to maintain the secrecy of Plaintiff's confidential and trade secret information both when Daughan and Kragh took Plaintiff's confidential and trade secret information without Plaintiff's consent and used confidential and trade secret information to divert or attempt to divert business from Ready Seafood.

71.     Packers Pride had reason to know Plaintiff's confidential and trade secret information secrets were acquired by improper means; nonetheless, Packers Pride profited from Daughan and Kragh's unlawful actions.

72.     Defendants knew or had reason to know that they had a duty to maintain the secrecy of Plaintiff's confidential and trade secret information, that they obtained by improper means, and breached that duty.

73.     Defendants used Plaintiff's confidential and trade secret information without Plaintiff's express or implied consent.

74.     Defendants knew or had reason to know, that at the time they used Plaintiff's confidential and trade secret information, that they were acquired under circumstances that gave rise to a duty to maintain the trade secrets' secrecy.

75.     Daughan and Kragh currently own and/or operate Packers Pride, a direct competitor of Plaintiff, are actively competing against Plaintiff via Packers Pride, are actively soliciting Plaintiff's customers, and are using, disclosing and/or threatening to use and disclose Plaintiff's confidential and trade secret information in connection therewith, in violation of the MUTSA.

76.     As a direct and proximate result of the misappropriation of trade secrets by Defendants, Plaintiff has been damaged in an amount to be proved at trial.

**COUNT III**
**ALL DEFENDANTS**
**(VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT)**

77.     Plaintiff repeats and realleges the preceding allegations as if fully incorporated herein.

78.     Defendants knowingly, willfully, and maliciously violated the provisions of the Federal Defend Trade Secrets Act of 2016 ("DTSA"), *18 U.S.C. §§ 1831-1839*, by

misappropriating and utilizing trade secret information belonging to Plaintiff, by improper means, for Defendants' own benefit. The confidential and trade secret information includes, without limitation, customer identity, profit margins, customer product volume demand, customer product pricing, and customer purchase history.

79.    The trade secrets that Defendants misappropriated are not available to the general public or to Plaintiff's competitors.    Plaintiff's confidential and proprietary information constitutes trade secrets under the DTSA for the following reasons:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain value from its disclosure or use; and

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

80.    Defendants' use of this information is a knowing, willful, and malicious violation of the DTSA.

81.    Plaintiff is the owner of the confidential and trade secret information, with rightful legal, and equitable title, and Plaintiff uses its confidential and trade secret information in its business of supplying lobster products from the coast of Maine to retail, wholesale, and food service companies across the United States and the globe.

82.    Daughan and Kragh own and manage Packers Pride, a New Hampshire-based enterprise that operates in interstate and foreign commerce.

83.    Without Plaintiff's authorization, in the days in weeks preceding their sudden resignations, Daughan and Kragh unlawfully gathered documents and information, containing

confidential and trade secret information belonging to Plaintiff, for subsequent competition with Plaintiff via Packers Pride.

84.     Daughan and Kragh had a duty to maintain the secrecy of Plaintiff's confidential and trade secret information.

85.     Daughan and Kragh breached their duty to maintain the secrecy of Plaintiff's confidential and trade secret information when Daughan and Kragh took Plaintiff's confidential and trade secret information without Plaintiff's consent.

86.     Packers Pride had reason to know Plaintiff's confidential and trade secret information secrets were acquired by improper means; nonetheless, Packers Pride profited from Daughan and Kragh's unlawful actions.

87.     Defendants knew or had reason to know that they had a duty to maintain the secrecy of Plaintiff's confidential and trade secret information, that they obtained by improper means, and breached that duty.

88.     Defendants used Plaintiff's confidential and trade secret information without Plaintiff's express or implied consent.

89.     Defendants knew or had reason to know, that at the time they used Plaintiff's confidential and trade secret information, that they were acquired under circumstances that gave rise to a duty to maintain the trade secrets' secrecy.

90.     Daughan and Kragh currently own and/or operate Packers Pride, a direct competitor of Plaintiff, are actively competing against Plaintiff via Packers Pride, are actively soliciting Plaintiff's customers, and are using and/or disclosing Plaintiff's confidential and trade secret information in connection therewith, in violation of the DTSA.

91.    As a direct and proximate result of the misappropriation of trade secrets by Defendants, Plaintiff has been damaged in an amount to be proved at trial.

### COUNT IV
### DEFENDANTS ANDREW DAUGHAN AND ROBERT KRAGH
### (BREACH OF FIDUCIARY DUTY AND OF DUTY OF LOYALTY AND GOOD FAITH)

92.    Plaintiff repeats and realleges the preceding allegations as if fully incorporated herein.

93.    Daughan and Kragh each had a confidential relationship with Plaintiff in which Plaintiff relied on and trusted Daughan and Kragh to act with good faith and in the best interest of the Plaintiff.

94.    Daughan and Kragh and Plaintiff had a relationship in which special confidence and trust was reposed with integrity and fidelity.

95.    As employees of the Plaintiff, Daughan and Kragh owed a fiduciary duty and duty of loyalty and good faith to diligently pursue business opportunities of the Plaintiff and its affiliates and to refrain from pursuing such opportunities on their own behalf and/or on behalf of any entity other than Plaintiff.

96.    Daughan and Kragh breached their duty not to disclose or use for their own benefit confidential information acquired in the course of their fiduciary relationship with Plaintiff.

97.    On the date of his resignation, Daughan took with him ten or more notebooks containing handwritten notes regarding the substance of communications with customers, tasks related to Daughan's role in overseeing Ready Seafood's global sales, tasks related to his role in Ready Seafood's inventory management, and various other notations concerning Ready

Seafood's confidential customer proprietary information and strategies for approaching all of the above.

98.     Sometime after Daughan resigned from Ready Seafood, he formed Packers Pride.

99.     Shortly before his resignation, from in and around May 7, 2025, until June 3, 2025, Kragh accessed confidential customer proprietary information including: (a) two PowerPoint presentations Ready Seafood used in 2023 sales pitch presentations with potential/existing customers; (b) two Excel Spreadsheets, with embedded formulas that Ready Seafood used in May and June 2024 to quote customer purchase orders; (c) an Excel Spreadsheet Kragh created comparing Ready Seafood's 2024 and 2025 purchase order history, product price point, amount of sales revenue generated, and the corresponding profit Ready Seafood received (reflected in dollars and as a percentage); and (d) a purchase order from July 25, 2024.

100.     Upon information and belief, Daughan and Kragh intentionally staggered their resignations for the purpose of, on one hand, allowing Daughan time to form Packers Pride and begin soliciting Ready Seafood's clients and, on the other hand, allowing Kragh additional time to misappropriate Ready Seafood confidential customer proprietary information, so that Packers Pride's had the benefit of such confidential customer proprietary information.

101.     For Daughan and Kragh's own benefit and/or the benefit of Packers Pride, Defendants Daughan and Kragh misappropriated confidential customer proprietary information acquired in the course of their fiduciary relationship with Plaintiff to use to divert business opportunities from Plaintiff.

102.     Daughan and Kragh's breach of their fiduciary duties, their duties of good faith, and their duties of loyalty were knowing and willful.

103.    As a direct and proximate result of Daughan and Kragh's breaches of the duties described herein, Plaintiff has been damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiff requests that judgment be entered in its favor and against Defendant to include permanent injunctive relief as follows:

A.    That Defendants be ordered to immediately return to Plaintiff all of Plaintiff's confidential, proprietary business information and trade secrets, including all copies of same, and specifically including without limitation all such information Defendants wrongfully appropriated;

B.    That the Court issue a Temporary Restraining Order, as well as a Preliminary and Permanent Injunction restraining and enjoining Defendants, and all other persons in active concert or participation with them, **indefinitely** from possessing, using, and/or disclosing Plaintiff's confidential, proprietary business information and trade secrets;

C.    That the Court issue a Temporary Restraining Order, as well as a Preliminary and Permanent Injunction, that:

   (1)    Restrains and enjoins Daughan, and all other persons in active concert or participation with him, **for a period of two years** from:

      (a)    soliciting or encouraging, directly or indirectly, any customer of Plaintiff with whom Daughan serviced or had any contact while employed by Plaintiff to terminate or otherwise modify adversely its business relationship with Plaintiff;

      (b)    soliciting or encouraging any such customer to do business with any person or entity that could be done with Plaintiff; or

      (c)    participate in making sales to any such customer that could be made by Plaintiff;

   (2)    Restrains and enjoins Daughan, and all other persons in active concert or participation with him, **for a period of two years** from competing against Plaintiff at the customer accounts he serviced while employed by Plaintiff;

   (3)    Restrains and enjoins Daughan, and all other persons in active concert or participation with him, **for a period of two years** from recruiting, soliciting, hiring, or otherwise employing any other current employee of Plaintiff;

Plaintiff further requests that this Court:

(1)    award Plaintiff monetary damages against Defendants and exemplary damages in an amount equal to twice the amount of monetary damages awarded against Defendants;

(2)    award Plaintiff its reasonable attorneys' fees, costs, and interest on those Counts that permit such recovery; and

(3)    order such other and further relief the Court deems just and equitable under the circumstances.

Dated: July 14, 2025                          Respectfully submitted,

                                              READY SEAFOOD CO.,

                                              By its attorneys,


                                               /s/ Frederick B. Finberg
                                              Frederick B. Finberg, Esquire
                                              rfinberg@thebennettlawfirm.com
                                              Peter Bennett, Esquire
                                              pbennett@thebennettlawfirm.com
                                              Brian L. Kennedy, Esquire
                                              bkennedy@thebennettlawfirm.com
                                              THE BENNETT LAW FIRM, P.A.
                                              75 Market Street, Suite 201
                                              Portland, ME  04101
                                              (207) 773-4775